1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**

7                         **DISTRICT OF OREGON**

8                         **PORTLAND DIVISION**

9
10
11   **RENEE SANDIDGE CROWELL**,                    No. 3:11-cv-00094-HU

12                 Plaintiff,                    **FINDINGS AND**
                                                 **RECOMMENDATION**
13        v.

14   **MICHAEL J. ASTRUE**,
     Commissioner of Social Security,

15
                     Defendant.
16   ────────────────────────────

17   Karen Stolzberg
     kstolzberg@juno.com
18   11830 SW Kerr Parkway, Suite 315
     Lake Oswego, OR 97035
19
20        Of Attorney for Plaintiff

21   S. Amanda Marshall
     United States Attorney
     Adrian L. Brown
22   Assistant United States Attorney
     District of Oregon
23   1000 SW Third Avenue, Suite 600
     Portland, OR 97204-2902
24
25   Keith Simonson
     Special Assistant United States Attorney
     Office of the General Counsel
26   Social Security Administration
     701 Fifth Avenue, Suite 2900 M/S 221A
27   Seattle, WA 98104-7075

28        Of Attorneys for Defendant

     Page 1 - FINDINGS AND RECOMMENDATION

**HUBEL, J.,**

Plaintiff Renee Sandidge Crowell ("Crowell") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and XVI of the Social Security Act. This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Following a careful review of the record, I conclude that the Commissioner's decision should be **AFFIRMED.**

## I.  PROCEDURAL BACKGROUND

Crowell protectively filed applications for DIB and SSI on September 29, 2005, alleging that she had been disabled and unable to work since January 1, 2005 due to an affective mood disorder and osteoarthrosis and allied disorder. (Tr. 92, 121-31.) Crowell was forty-nine years old on the alleged disability onset date. (Tr. 121.) Her applications were denied initially and upon reconsideration on December 13, 2005, and June 2, 2006, respectively. (Tr. 24.) Crowell appeared and testified at a hearing held on July 17, 2008, before Administrative Law Judge ("ALJ") Catherine Lazuran. (Tr. 24, 40.) The ALJ issued a decision denying Crowell's claim for benefits on December 23, 2008. (Tr. 40.) Crowell timely requested review of the ALJ's decision, which was denied by the Appeals Council on December 10, 2010. (Tr. 1-3.) As a result, the ALJ's decision became the final decision of the Commissioner that is subject to judicial review.

## II.  FACTUAL BACKGROUND

On June 15, 2005, Crowell saw Maile McCluskey ("McCluskey"), M.A., for an initial Behavioral Health Assessment. (Tr. 293.)

Page 2 - FINDINGS AND RECOMMENDATION

1   Despite being five and a half months after the alleged onset of
2   disability, this is earliest medical record in the administrative
3   record. McCluskey's diagnoses included "Major Depressive Disorder,
4   recurrent, severe without psychotic features" and posttraumatic
5   stress disorder ("PTSD") (Axis I); "Methadone treatment" (Axis
6   III); and financial issues (Axis V).   (Tr. 295.)   In McCluskey's
7   opinion, Crowell endorsed symptoms "consistent with depression and
8   anxiety, specifically PTSD." (Tr. 295.)

9       On June 21, 2005, Crowell had x-rays of her right knee and
10  pelvis taken at Oregon Health & Science University ("OHSU").   (Tr.
11  319-20.)   On that same day, Mark David Kettler ("Kettler"), M.D.,
12  confirmed that Crowell had "[n]ormal right knee radiographs" and a
13  "[n]ormal pelvis radiograph." (Tr. 319-20.)

14      McCluskey conducted the second portion of the Behavioral
15  Health Assessment on June 27, 2005.   (Tr. 297.)   During the
16  examination, Crowell reported stealing in order to make money to
17  pay rent, a history of illicit drug use, and always questioning
18  authority in school. (Tr. 297.)  McCluskey noted that Crowell has
19  numerous arrests related to stealing and forgery, and that she had
20  been hospitalized after attempting to commit suicide four or five
21  years ago. (Tr. 298.)  Crowell was also "[c]urrently participating
22  at Allied for methadone treatment." (Tr. 299.)  After concluding
23  his examination, McCluskey chose not to change the diagnoses set
24  forth in the initial Behavioral Health Assessment.  (Tr. 299-300.)

25      Jill Spendal ("Spendal"), Psy.D., conducted a Psychological
26  Evaluation on July 29, 2005. (Tr. 246.)  Spendal began by noting
27  Crowell has a long history of anxiety, depression, and anger. (Tr.
28  246.)  More recently, Crowell has experienced "rage blackouts" and

Page 3 - FINDINGS AND RECOMMENDATION

an increase in the frequency and intensity of her panic attacks. (Tr. 246.)  Crowell has also been "unnerved by her recent desire to harm other people," such as an incident where she wanted to stab a man who stole property from her.  (Tr. 246.)

Crowell described herself to Spendal as the product of an environment and upbringing that was less than ideal.  Apparently, Crowell was placed in foster care at the age of two, she was raped in the sixth grade while intoxicated, her father was a high school dropout with a history of domestic violence, her brother was murdered at age sixteen, she "recall[s] being [sexually] abused in many foster care homes," her mother was an alcoholic who "was married seven times and eventually committed suicide," Crowell had her first child at age eighteen, and she was a victim of domestic violence as a teenager.  (Tr. 246-47, 250.)

Crowell reported always doing well in school and indicated she was "not concerned about her intellectual functioning." (Tr. 247.) In fact, Crowell earned her General Equivalency Degree ("GED"), she took college courses at Western Oregon University while incarcerated,[1] she earned her paralegal license after taking two years of pre-law courses at Portland Community College ("PCC"), and "she earned enough credits for three Associates degrees at PCC . . . then transferred to Portland State University where she earned her Bachelors degree in Liberal Arts." (Tr. 247.) Crowell was interested in attending Lewis & Clark Law School, but chose to

---

[1]    Crowell says she was incarcerated in 1983 for "writing bad checks as part of a scam she was involved in with a man she was 'co-dependent with.'" (Tr. 250.)

Page 4 - FINDINGS AND RECOMMENDATION

buy a home and could no longer afford to continue her education. (Tr. 248.)

In terms of employment history, Crowell reported to Spendal that:

> Generally jobs start well because she is a 'fast learner,' but 'go to shit' quickly. She oversleeps and is late often, and has difficulty getting to work on time if she has not had her methadone, and the methadone clinic is not usually open before work so she has to leave work to get her dose, which leads to her bosses 'riding her,' which she does not respond well too.  If she does not get her methadone before going to work she is 'an emotional mess, which doesn't go over well either.' . . . She also gets 'sick a lot' and misses work. . . . She cannot get along with her co-workers, and is often too direct and blunt; she struggles with work place politics and often ends up being confrontational with her bosses.

(Tr. 248.)  Crowell said she quit her most recent phone solicitation position in order to avoid being fired.  (Tr. 248.) She has no source of income and "gets by through shoplifting merchandise from large retail stores and then paying people to return the items for cash."  (Tr. 248.)

Crowell described a long history of counseling regarding her mental health issues and drug and alcohol abuse.  (Tr. 249.)  She has attempted suicide on several occasions, the last of which (overdose on pills) occurred four yeas ago and resulted in inpatient hospitalization.  (Tr. 249.)  According to Spendal, Crowell endorsed several symptoms consistent with PTSD, such as:

> hyper vigilance of her environment (she must stand with her back to a wall), a dislike of groups (she prefers to wear sunglasses to talk to people or else feels very vulnerable), nightmares, intrusive memories of traumatic events, trying to avoid certain memories, some memory loss around past traumatic events, mental and physiological distress in response to certain memories, avoiding certain types of people, anger outbursts, and heightened startle response.

Page 5 - FINDINGS AND RECOMMENDATION

(Tr. 250.)  In Spendal's opinion, Crowell's "blackouts" could be viewed "as periods of disassociation sometimes seen in severe cases of PTSD.  [Crowell]'s history of childhood sexual abuse, rape, domestic violence, the murder of her brother, and the suicide of her mother, could all be individual traumatic events that combine to create a severe and chronic PTSD profile."  (Tr. 250.)

Spendal administered the following tests during her evaluation:  Structured Clinical Interview; Wechsler Adult Intelligence Scales, Third Edition ("WAIS-III"); Wechsler Memory Scales, Third Edition ("WMS-III"); Minnesota Multiphasic Personality Inventory- 2 ("MMPI-2").  (Tr. 251.)  Spendal's Axis I diagnoses were PTSD (chronic), Panic Disorder without Agoraphobia (provisional), Dysthymic Disorder, Opiod Dependence (in sustained partial remission), and Cannabis Abuse (in early partial remission).  (Tr. 255.)  The remainder of Spendal's diagnoses were "Personality Disorder, NOS, Borderline and Antisocial Features" (Axis II); "knee and hip pain, methadone treatment" (Axis III); and "unemployment, finances, lack of support network" (Axis IV).  (Tr. 255.)  Spendal believes

> [Crowell's] diagnoses combine to mean that [she] will struggle with socially acceptable functioning in situations that involve other people; they also mean that at times she will be a danger to herself or to those around her.  Her ability to be successful in an employment situation will be very limited until she is able to treat her diagnoses more successfully.  She needs to be involved in intensive regular therapy and under the close supervision of a psychiatrist to manage her medication.  [Crowell] may be a good candidate to apply for social security disability until such a time as she can make progress in these areas.

(Tr. 256.)

Page 6 - FINDINGS AND RECOMMENDATION

Overall, Spendal concluded Crowell has the following barriers to employment:

- <u>Mobility</u>: [Crowell]'s mobility needs to be determined by a medical doctor, especially given her knee and hip pain.
- <u>Self-Direction</u>: [Crowell] has the intelligence and memory functioning to be self-directed in the workplace; however, both of these things will vary widely depending on her level of anxiety and the extent to which her PTSD is triggered. They will also vary depending on her continued abstinence from substances and her methadone treatment compliance. She will need to write notes for herself and will need repetition of important information because when she is distressed her attention declines resulting in poor memory for information.

- <u>Self-Care</u>: [Crowell] does not demonstrate any limitations in self-care. It is possible that this will change based on her ability to get her mental health under better control and her ability to remain substance-free.

- <u>Work Skills</u>: [Crowell] will do better in jobs and training situations that are more visual than verbal. She will also remember information better if it is of a visual nature. Although, at worst her reasoning is average and her memory is low average. Her attention is likely the most variable work skill she has, and this will vary based on her emotional functioning.

- <u>Interpersonal Skills</u>: This is the area [Crowell] will struggle most significantly. Her PTSD symptoms and personality disordered features will combine to make interpersonal relationships very challenging. If she feels stressed or threatened, or if she is triggered in some way, she is likely to become either emotionally upset (crying and sad and emotionally liable) or extremely agitated (violent towards others can be part of this) making her an unpredictable co-worker and employee.

- <u>Communication</u>: [Crowell] will have no difficulty reading written communication or generating written communications. She will be able to generate average verbal communications due to her average verbal intelligence. The only area in which [Crowell] may struggle is comprehension of verbal communications, due to her auditory attentional variabilities. She may miss important information if she loses focus or concentration. Again, these comprehension problems will vary based on her emotional functioning and how overwhelmed or threatened she may be feeling.

- <u>Work Tolerance</u>: So much of [Crowell]'s energy is used on her emotional functioning and trying to maintain an acceptable level of functioning that she will likely tire far quicker than her age peers. Her full mental health profile will greatly reduce her work stamina.

Page 7 - FINDINGS AND RECOMMENDATION

(Tr. 257-58.)

On August 2, 2005, Crowell attended a counseling session at OHSU with McCluskey. (Tr. 603.) Crowell "reported that she continue[d] to experience a high degree of anxiety and she continue[d] to isolate [herself] due to not trusting others or herself in getting along with other people." (Tr. 603.)

On August 3, 2005, Crowell saw Paul Leung ("Leung"), M.D., at OHSU for a psychiatric evaluation. (Tr. 301.) At that time, Crowell remained "depressed, but not as it was at its worst." (Tr. 301.) Her worst depression was seven years prior when Crowell acknowledged she was abusing heroin and lost her newly acquired home. (Tr. 301.) Crowell had been prescribed several medications for her depression with "no good results," including Paxil, Wellbutrin, and Celexa. (Tr. 301.) Crowell said she had been married five times and "divorced her last husband about three years ago." (Tr. 302.) Crowell reported using heroin for a much longer time than she had used marijuana, cocaine, LSD, and speed. (Tr. 302.) During her mental status examination, Crowell's "thoughts were clear, goal-directed, and linear, with no signs or symptoms of psychosis." (Tr. 302.) Her cognitive examination showed adequate insight and good judgment, and her memory and concentration appeared basically intact. (Tr. 302.) Leung's August 2005 psychiatric evaluation references Axis I diagnoses of: "Chronic depression/dysthymic disorder, at times superimposed on major depression"; "Significant alcohol and drug history in her past, including the use of heroin, cocaine, and others"; and PTSD "given her significant history of abuse in childhood as well as later on

Page 8 - FINDINGS AND RECOMMENDATION

in her marital relationships with men."[2]  (Tr. 302.) Leung's only Axis II diagnosis was: "Borderline personality traits, if not disorder . . . [which] needs to be worked out with a clinician." (Tr. 302.)

On September 7, 2005, Crowell attended a counseling session with McCluskey at OHSU. (Tr. 597.)  Crowell "presented as anxious evidenced by her sweating, fidgeting and difficulties with attention." (Tr. 598.)  In October 2005, Crowell told McCluskey she experienced "a lot of anxiety last week" and that her seizure medication (Clonazepam) dosage needed to be increased.  (Tr. 597.)

On October 24, 2005, Crowell's friend, Patrick Magin ("Magin"), completed a Function Report – Adult – Third Party. (Tr. 159.)  Magin indicated that Crowell's daily activities consist of walking her dog, going to the clinic for her daily methadone dose, seeking stress-related "assistance," and sleeping.  (Tr. 159.) Magin observed that, although Crowell does not care for a spouse or child, she does take care of her dog.  (Tr. 160.)  According to Magin, Crowell used to be able to "function better," communicate with people, "be more physical," and control her emotions; however, "now [she] has anger issues, panic attacks, physical pain, etc." (Tr. 160.)  Magin indicated that Crowell is prone to insomnia, which, in turn, exacerbates her daytime exhaustion.  (Tr. 160.)

In terms of personal care, Magin observed that Crowell bathes occasionally and demonstrates a "lack of concern" regarding her physical appearance and dietary needs.  (Tr. 160.)  Magin stated

---

[2]    Leung's August 2005 evaluation states, "at this point [Crowell] claims that she is clean and sober with a clean urine to prove it."  (Tr. 302.)

Page 9 - FINDINGS AND RECOMMENDATION

that Crowell's memory is poor and she has a difficult time completing household chores due to "knee, hip, and general pain issues." (Tr. 161.) Magin indicated that, although he has seen "a major increase in forgetfulness," Crowell is capable of grocery shopping, paying bills, counting change, handling a savings account, and using a checkbook. (Tr. 161.) Magin stated that Crowell's hobbies and interests include walking her dog, watching television, painting, and drawing. (Tr. 163.) In Magin's opinion, Crowell's interest in these activities has diminished due to her depression-related symptoms. (Tr. 163.) With respect to social activities, Magin observed that Crowell is a "loner," who is "intensely private and has "difficulty spending much time with others." (Tr. 163.)

Magin described Crowell as "fearful, impatient, [and] frequently angry." (Tr 164.) He believes Crowell's physical and mental impairments affect her: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. (Tr. 164.) Magin observed that Crowell also has "major issues with all authorities" and suffers "[m]any phobias," such as fear of persecution, homelessness, and human contact. (Tr. 165.) In his concluding remarks, Magin stated:

> [Crowell] is an intelligent, talented person. She is not my friend out of sympathy- but out of mutual interest (we are both artists). In spite of her problems, she is acutely self-aware (self-critical), and I feel deserves credit and encouragement for attempting to deal with her issues at this point in her life. She is intensely proud, and has a hard time asking anyone for help. She is trying to overcome this tendency, and my hope is that . . . [since she is] reaching out for help, [she]

Page 10 - FINDINGS AND RECOMMENDATION

will find a helping hand.  She has great potential, and great problems, as well.

(Tr. 166.)

Crowell completed a Function Report – Adult on October 25, 2005.  (Tr. 167.)  She indicated that her daily activities consist of walking her dog, taking the bus downtown to her methadone clinic, attending psychiatric appointments, going to the store, and "trying to find housing before [she is] on the streets."  (Tr. 167.)  Crowell confirmed that she takes care of her dog, which, at times, requires assistance from friends when she is "sick or very stressed."  (Tr. 168.)  Crowell says her condition impacts her ability to deal with stressful situations, complete physical tasks, retain information, and sleep.  (Tr. 168.)

With respect to personal care, Crowell indicated she no longer bathes on a daily basis (2-3 times a week); she doesn't get haircuts; she has "terrible" eating habits and often times will not eat for one or two days; and she frequently is constipated and/or has irregular bowel movements.  (Tr. 168.)  Crowell often needs reminders to take her medication as well.  (Tr. 169.)  She performs a limited amount of household chores, such as laundry, sweeping the porch, and occasionally ironing.  (Tr. 169-70.)  Crowell says she cannot pay bills, count change, handle a savings account, or use a checkbook.  (Tr. 170.)  As she explained, "I have [no] money, I get confused when I count [money] sometimes or lose it.  I can't remember to write down transactions in a checkbook . . . so I become overdrawn and make a mess."  (Tr. 170.)

In terms of hobbies and interests, Crowell watches television and used to paint and draw, but has "lost [her] ambition."  (Tr.

Page 11 - FINDINGS AND RECOMMENDATION

171.)  Aside from appointments, Crowell's social activities consist mainly of drinking coffee with Magin once or twice a week because she "almost always has problems with people," doesn't "trust them," and "attract[s] bad people." (Tr. 171-72.)  According to Crowell, her impairments affect her: lifting, squatting, bending, standing, walking, kneeling, talking, stair climbing, memory, completing tasks, concentration, understanding, following instructions, and getting along with others.  (Tr. 172.)

On November 22, 2005, Nikolas Jones ("Jones"), M.D., examined Crowell at MDSI Physician Services regarding her right knee and hip pain.  (Tr. 271.)  Crowell did not report the cause of her hip pain, but her knee pain reportedly stems from an injury sustained in a motor vehicle accident.  (Tr. 271.)  Although Crowell has aching, sharp pain in her knee on a daily basis, she says "methadone helps significantly." (Tr. 271.)  Methadone also helps alleviate the pain Crowell experiences in her hip while walking. (Tr. 271.)  Jones found that Crowell's

> right hip area, especially anterior and over the greater trochanter on the femur, are tender to palpation.  There is no crepitus or deformities appreciated otherwise.  The right knee is diffusely tender to palpation, but worse over the anterior surface.  There is no specific joint line or bony point tenderness.  It is just diffusely tender.  No swelling is appreciated.

(Tr. 273.)  Jones also made the following diagnoses:

> 1. Right knee pain. The claimant reports right knee pain from an injury years ago.  This is probably due to arthritis at this point in time.  I do not feel there is any ligamentous or any other injury at this point in time.  Certainly, there is no neurologic compromise.

> 2. Right hip pain.  The claimant has a long history of right hip pain, most [likely] due, again, to arthritic change.  I see no evidence of any significant impairment of her range of motion.  There is no evidence of infection or any fracture at this point in time.

Page 12 - FINDINGS AND RECOMMENDATION

(Tr. 274.)  Jones estimates that Crowell could be expected stand, sit and walk six hours in an eight-hour workday.  (Tr. 274.)  She could also be expected to lift and carry twenty pounds occasionally and ten pounds frequently.  (Tr. 274.)  Although Jones found Crowell has no manipulative limitations and "is able to walk without significant impairment," he indicated Crowell might have difficulty with repetitive stooping, kneeling and crawling based on her hip and knee pain.  (Tr. 274.)

On November 29, 2005, McCluskey provided Crowell with behavioral health counseling at OHSU.  (Tr. 595.)  Crowell indicated "that despite [current] stressors her anxiety is manageable and that she has not experienced any rage episodes.  She further reported that her ability to handle and tolera[te] stressful situations has increased."  (Tr. 595.)

On December 6, 2005, state agency medical consultant Sharon Eder ("Eder"), M.D., completed a Physical Residual Functional Capacity Assessment ("PRFCA").  (Tr. 323, 330.)  Eder found Crowell could lift and/or carry twenty pounds occasionally, ten pounds frequently, could stand and/or walk about six hours in an eight-hour workday and could sit about six hours in an eight-hour workday.  (Tr. 324.)  In terms of postural limitations, Eder opined Crowell would frequently have difficulty balancing and occasionally have difficulty climbing (ramps/stairs/ladder/rope/scaffolds), stooping, kneeling, crouching, and crawling due to "hip and knee pain from probable arthritis."  (Tr. 325.)  Eder noted no manipulative, visual, communicative or environmental limitations. (Tr. 326-27.)  Ultimately, Eder concluded Crowell "may have some

1  [joint] pain from osteoarthritis but [there is] no evidence of
2  significant limitation." (Tr. 330.)

3      On December 8, 2005, McCluskey provided Crowell with
4  behavioral health counseling at OHSU. (Tr. 594.) Crowell
5  "reported that her mood is a 7 out of 10 . . . [and] that her mood
6  has been good for the past two weeks." (Tr. 594.)

7      On December 12, 2005, state agency psychologist Dorothy
8  Anderson ("Anderson"), Ph.D., completed a Psychiatric Review
9  Technique Form ("PRTF"), wherein she evaluated Crowell's
10 impairments under listing 12.04 (affective disorders), 12.06
11 (anxiety-related disorders), 12.08 (personality disorders), and
12 12.09 (substance addiction disorders). (Tr. 275.) She concluded
13 that Crowell's impairments failed to satisfy listing 12.04, 12.06,
14 12.08, or 12.09. (Tr. 278-83.) Anderson's notations state that
15 "[e]vidence shows that [Crowell] retains the ability to perform
16 very simple work with limited contact with others secondary to
17 anxiety and [PTSD]." (Tr. 287.)

18     On December 12, 2005, Anderson also submitted a Mental
19 Residual Functional Capacity Assessment ("MRFCA"), which describes
20 Crowell as "[m]oderately [l]imited" in six of twenty categories of
21 mental activity and "[n]ot [s]ignificantly [l]imited" in fourteen.
22 (Tr. 289-90.) Anderson's concluding remarks indicate: Crowell is
23 "capable of understanding, remembering and carrying out short and
24 simple, but not detailed and complex instructions/tasks"; she
25 "[s]hould not work in close proximity to, or in close coordination
26 with more than a few others given [her history] of anxiety and
27 PTSD"; she "should have limited, structured contact with the
28 general public, coworkers and supervisors and should not be

Page 14 - FINDINGS AND RECOMMENDATION

required to work in a public setting"; and "[n]o evidence of significant limitations." (Tr. 291.)

In 2006, Crowell participated in behavioral health counseling at OHSU on February 9, February 28, March 9, March 30, April 11, and April 27. (Tr. 588-93.) The 2006 progress notes from Crowell's therapy session at OHSU provide little, if any, information. As a result, those notes will not be detailed in the Factual Background of this Findings and Recommendation.

On April 27, 2006, McCluskey completed a discharge summary regarding Crowell's treatment at OHSU. (Tr. 587.) At that time, McCluskey indicated that Crowell's depression, PTSD-related symptoms, and history of panic attacks, alcohol and substance abuse were "[s]ignificant [p]roblems [i]dentified [d]uring [t]reatment." (Tr. 587.) McCluskey's diagnoses included "Major Depressive Disorder, recurrent, without psychotic features", PTSD, and Polysubstance Abuse (Axis I); "Borderline personality disorder" (Axis II); "chronic pain, hepati[t]is C" (Axis III); "limited resources, relationship problems" (Axis V); and a current Global Assessment of Functioning ("GAF") at 60 (Axis V).[3] (Tr. 587.)

---

[3] "Clinicians use a GAF to rate the psychological, social, and occupational functioning of a patient. The scale does not evaluate impairments caused by psychological or environmental factors. A GAF between 41 and 50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Morgan v. Comm'r of Soc. Sec.*, 169 F.3d 595, 598 n.1 (9th Cir. 1999). A GAF of 60 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." The American Psychiatric Association, *Diagnostic and Statistical Manual of*

1      On August 24, 2006, Crowell saw Minot Cleveland ("Cleveland"),

2  M.D., at Legacy Good Samaritan Hospital. (Tr. 374.)   Crowell

3  reported she tripped and fell down steps at a MAX station, which

4  resulted in injuries to her right shoulder and chest. (Tr. 372.)

5  Cleveland's  progress  notes  indicate  Crowell  had  multiple

6  contusions, but all x-rays were negative.   (Tr. 373.)   After

7  observing that Crowell was in a methadone maintenance program and

8  a "recovering addict," Cleveland said she would provide one pain

9  medication prescription (ten "Vicodin 5 mg") and instructed Crowell

10  to apply ice intermittently.  (Tr. 372-73.)

11     On August 30, 2006, Crowell saw Cleveland because she was

12  still experiencing right lateral chest wall pain.  (Tr. 364, 366.)

13  Cleveland determined Crowell suffered a contusion to her chest and

14  right ribs and prescribed "Robaxin for pain control."  (Tr. 365.)

15     On October 24, 2006, Crowell visited Eugene Taylor ("Taylor"),

16  M.D., at Lifeworks Northwest.[4]  (Tr. 400.)   During the

17  consultation, Crowell said she recently went out with man who tried

18  to kill her and knocked her upper front incisor teeth out.  (Tr.

19  400.)  Taylor confirmed "[s]he showed [him] the gap in her upper

20  teeth." (Tr. 400.)  Crowell also discussed an incident where she

21  became so incensed with a bus driver that she eventually had a

22  seizure and lost consciousness.  (Tr. 400.)  In Taylor's opinion,

23

24  ────────────────────

25  *Mental Disorders* 34 (4th ed. 2000).

26      [4] Taylor's October 24, 2006 progress note indicates Crowell
began seeing him in June of 2006 and, at that time, she was already
27  taking Trazodone and Zoloft, in addition to her seizure-related
medication (Clonazepam).  (Tr. 400.)

28

Page 16 - FINDINGS AND RECOMMENDATION

Crowell "has a great deal of problems with anger control."  (Tr. 400.)

Crowell had a phone consultation with Taylor on November 21, 2006.  (Tr. 398.)  Crowell reported experiencing "three bad panic attacks which ended with seizure-like shaking of her body" and that she was suing the bus company because "she has continued to have trouble with bus drivers, particularly when she wants to take her therapy dog Koji on the bus." (Tr. 398.)  Because Crowell indicated she has difficulty breathing during "panic episodes," Taylor had Crowell hold her breath as long as she comfortably could while on the phone.  (Tr. 398.)  Taylor said Crowell "was able to do this comfortably for a period longer than I was able to hold my breath comfortably." (Tr. 398.)  It was therefore recommended to Crowell that she regularly practice "holding her breath for short periods of time to get a feeling of what she should do when she is getting a panic attack."  (Tr. 398.)

Taylor and Crowell had a "long phone conversation" on December 26, 2006, during which Crowell reported having a recent surgery where the doctor's "were looking for cancer." (Tr. 396.)  Crowell and Taylor spent a majority of the conversation discussing Crowell's troubles with her stepmother. (Tr. 396.)

On March 6, 2007, Taylor and Crowell had a face-to-face consultation.  (Tr. 395.)  Crowell asked Taylor to sign a "disability verification" form concerning "her eligibility for disability such that her ability to live independently could be improved by more suitable housing conditions." (Tr. 395.)  Crowell indicated she was in the process of trying to obtain SSI or DIB,

Page 17 - FINDINGS AND RECOMMENDATION

but had been turned down twice thus far. (Tr. 395.) Taylor made it a point to state: "I did not indicate that I was attesting to her inability to engage in any substantial [gainful] activity. . . . [Rather,] I signed a disability form indicating that [Crowell] had a disability which impaired her ability to live independently and which would be helped by more suitable housing conditions." (Tr. 395.) During Taylor's interview, Crowell's dog behaved in a manner which she "interpreted as meaning that he was concerned that she would have a seizure," however, although Crowell became "quite apprehensive," Taylor was able to divert her attention and she did not have a seizure. (Tr. 395.) Crowell's prescriptions for Clonazepam (one additional refill), Trazodone, and Zoloft were also renewed that day. (Tr. 394.)[5]

On April 26, 2007, Paul Kassar ("Kassar"), M.D., treated Crowell "presumably for anaerobic pneumonia." (Tr. 333, 335.) Crowell originally reported to Providence Portland Medical Center on April 24, 2007, complaining of "2 weeks of cough and fevers," "not feeling well for the last 9 months," and "right-sided upper back chest pain." (Tr. 337.) Crowell indicated, among other things, that she occasionally uses marijuana and intravenous cocaine, and she smokes a pack of cigarettes a day. (Tr. 337-38.) Kassar prescribed Crowell "a prolonged course of oral antibiotics,

_____

[5] Taylor's March 6, 2007 progress note references Clonazepam and Klonopin; however, it appears that Taylor simply uses these drug names interchangeably. *See Galvin v. Cook*, Civ. No. 00-29-ST, 2000 WL 1520231, at *2 (D. Or. Oct. 3, 2000) (recognizing that Klonopin is a brand name for Clonazepam, an oral medication in the family of benzodiazepines that is used to treat seizures, panic disorders and anxiety).

including 4 weeks of clindamycin, and 10 days of ciprofloxacin." (Tr. 335.)  She was instructed to return for a follow-up consultation in 3-4 weeks because, if her symptoms did not improve (right upper lobe lesions), "she w[ould] need a bronchoscopy, and biopsy of the lesions, to rule out malignancy." (Tr. 335.)

Crowell returned to Taylor's therapy clinic on May 8, 2007, and reported having a "lesion o[n] her right lung." (Tr. 392.)  At that time, Taylor thought Crowell was "making some good progress," however, he also said, "[i]t is . . . of considerable interest that [Crowell] was recently arrested for shoplifting." (Tr. 392.) Crowell told Taylor "she is most likely to get involved in shoplifting when she gets angry about something." (Tr. 392.)

On May 27, 2007, Crowell reported to the emergency room at Providence Portland Health Services, complaining of injuries sustained from a slip-and-fall incident. (Tr. 331-32, 334.) Crowell fell on her face and left hand while walking her dog and expressed uncertainty as to whether she lost consciousness. (Tr. 331.) Crowell repeatedly told the nurse practitioner "that she has a hard time tolerating pain medicine because she has a prior history of drug use, so she needs 'double the pain medicine that normal people need' and it is her hand that is really giving her trouble." (Tr. 331.)  Crowell refused a head CT scan since it would take a couple hours, but agreed to a x-ray of her left hand. (Tr. 332, 334.)  Because the x-ray revealed "an area of lucency in the midshaft of the left 5th metacarpal," Crowell's injury was treated as a fracture and she was provided a splint along with a prescription for oxycodone. (Tr. 334.)    Although Crowell was

prescribed "15 oxycodone 5 mg from the ER," she apparently "used 10 of them in 24 hours" because she was "having difficulty with pain control." (Tr. 334.)

Crowell had a phone conversation with Taylor on July 10, 2007, during which she was "very angry" and suggested she wanted to commit suicide by jumping off a bridge with her dog. (Tr. 392.)

On July 11, 2007, Crowell had a follow-up visit with Louis Libby ("Libby"), M.D., regarding her pneumonia. (Tr. 340-41.) After reviewing chest x-rays from that day, Libby concluded that Crowell's "cavitary pneumonia [was] resolved." (Tr. 341.) Libby "suspect[ed] it was a community-acquired pneumonia possibly with anaerobic infection because of her . . . history of drug use as well as seizures." (Tr. 341.)

On July 12, 2007, Crowell telephoned Taylor's office to request an appointment. (Tr. 389.) The following narrative recounts the conversation that took place between Crowell and a member of Taylor's staff:

> [Crowell] called me this morning. She wanted to set up an appointment with Dr. Taylor. I told her that she missed several appointment[s] with Dr. Taylor includ[ing] last Tuesday 7/10/07. [Crowell] said 'you didn't set up an appointment for me. You are [a] liar!' I explained [to] her that I talked to her on Tuesday morning to remind her at 8:05 am. [Crowell] said 'I didn't talk to you.' I offered her MP slots since she missed several appointments. Then she told me she doesn't need an appointment but she needs medication. Because we haven't seen her for awhile, I asked her to come in [for an] appointment then she will get medication. [Crowell] was very upset because she doesn't have any medication left. According to our record, she should have enough medication until 7/19/07. She then told me she will call Dr. Taylor's house even [though] I told her to not call him at his home. Then she hung up the phone.

(Tr. 389.)

Page 20 - FINDINGS AND RECOMMENDATION

Taylor eventually had a face-to-face consultation with Crowell on July 24, 2007. (Tr. 387.) His progress notes indicate that Crowell recently "started using heroin again when her daily supply of methadone could only provide 40 mg a day," and her "lesion ha[d] apparently completely disappeared and she was told she does not have cancer." (Tr. 387-88.)

On August 3, 2007, Crowell was temporarily detained for physician evaluation by the Emergency Department ("ED") at Good Samaritan Hospital because she said "[i]f I don't get methadone, I will kill myself." (Tr. 357.) Soon thereafter, Crowell was evaluated by Deborah Robertson ("Robertson"), M.D., whose treatment notes state:

> I explained how I could not [prescribe] methadone. . . . I ultimately decided to prescribe a fentanyl patch[.] . . . [Crowell] was becoming quite agitated while waiting for all the data collection/ discussion and decision making to take place. . . . [Crowell] returned to the ED stating she could not get the fentanyl patch filled. Therefore, a comp fill was obtained. She was told this could take awhile and while waiting she became acutely agitated in [the] waiting room, swearing and security was called. She left the department frustrated that no one was helping her. Unfortunately, a few minutes later, [the] pharmacy completed the comp fill and it was delivered to ED. She was nowhere to be found and it was returned to [the] pharmacy.

(Tr. 359-60.)

On August 6, 2007, Taylor completed a progress note detailing a telephone conversation with Crowell and a physician from the ED at Good Samaritan regarding the August 3 incident. (Tr. 384.) Taylor contacted the owner of Crowell's current methadone program ("RAM") because she was upset about being transferred to another methadone program ("CODA"). (Tr. 384.) RAM's owner, who has known

Crowell for "many years," agreed to provide Crowell methadone until she was admitted to CODA, but also said "that even with detoxification, [Crowell] would be in extreme discomfort." (Tr. 384.) At that time, Crowell reported spending "all of her time" thinking of ways to kill her dog and commit suicide, including going to bars and asking for enough alcohol to kill herself. (Tr. 384.) Crowell said she "thinks that on [RAM's] 21 day detoxification plan she can only last about ten days before she would start to use heroin again." (Tr. 384.) RAM's owner was of the opinion that Crowell "may have already started using heroin." (Tr. 384.) In Taylor's opinion, "even if [Crowell] starts buying heroin on the street or has already, [attempting the detoxification plan] would still be some progress." (Tr. 385.)

During an August 13, 2007 consultation with Taylor, Crowell indicated RAM was continuing to give her methadone services free of charge. (Tr. 382.) Crowell used to participate in CODA's methadone program, but developed an unspecified conflict with CODA's staff. (Tr. 382.) Crowell informed Taylor she had a new primary care provider, who is legally authorized to prescribe methadone to her. (Tr. 382.) Taylor's progress note indicates he planned on slowly tapering Crowell off her dose of Clonazepam after she was in a stable program for methadone maintenance and a psychotherapy plan had been established. (Tr. 383.) He also provided Crowell a prescription for Geodon on August 6, 2007, but she had "forgotten to start taking it." (Tr. 382.)

Keeping in mind Crowell was to receive methadone in a daily dose, the medical evidence provided by Crowell's methadone clinic from August 31 through September 17, 2007 indicates the following:

- August 31- Crowell reported "currently having thoughts of getting run over by a train" and indicated she wanted to die along with her dog "so they could be together in the after life." (Tr. 448.) She also admitted "using about one-half to one gram of heroin intravenously each day and sa[id] that her last use was 'late last night.'" (Tr. 448.) Crowell's weekly random urinalysis test was positive for tetrahydrocannabinol ("THC") and Opiates. (Tr. 558.)

- September 4- Crowell misses her methadone dose and admits to using heroin, which she described as "bad dope" that made her feel "like [her] head was splitting open." (Tr. 543-44.)

- September 5- Crowell was "half dosed for safety," presumably because she missed a recent methadone dose and admitted to using heroin. (Tr. 545.) She also attended an individual therapy session, during which Crowell asked if she could receive the same methadone dose she was receiving at RAM. (Tr. 538.) When her therapist, Dave Henderson ("Henderson"), indicated he didn't "have the authority," Crowell said, "that's all the fuck I wanted to know." (Tr. 538.) She immediately left the office and slammed the door. (Tr. 538.)

- September 7- Crowell indicated she used cocaine once in the past week, heroin "6 days, 2x per day, am[oun]t varies," and nicotine everyday. (Tr. 432.) Overall, Crowell said she had been using heroin "off and on for the last 3 months" and used cocaine "more than once a week" when she was being detoxed over the last two months. (Tr. 444.) Crowell reported being arrested twice in the last five years and spending a total of five years of her life incarcerated. (Tr. 441.) CODA determined Crowell "meets DSM-IV criteria for Opiod Dependence . . . based on tolerance, withdrawal, and a great amount of time spent obtaining, using, or recovering from drug use. She also meets DSM-IV criteria for Cocaine Abuse . . . based on continued use despite social or interpersonal problems." (Tr. 446.)

- September 17- Crowell still had *not* abstained from illicit opiates and had not been in compliance with group counseling attendance. (Tr. 539.)

On September 17, 2007, Crowell had a follow-up visit with Taylor regarding her "depression, panic disorder[s], PTSD symptoms, and opiod dependency on methadone therapy." (Tr. 381.) Although

Page 23 - FINDINGS AND RECOMMENDATION

Taylor instructed Crowell to continue taking Zoloft and Trazodone, he replaced Geodon with Abilify for purposes of "managing anger." (Tr. 381.)

The medical evidence provided by Crowell's methadone clinic from September 18, 2007 through February 7, 2008 indicates the following:

- September 18- Crowell's weekly random urinalysis test was positive for THC. (Tr. 558.)

- September 21- Crowell participated in a group counseling session. (Tr. 537.)

- September 25- Crowell missed her methadone dose due to illness, but denied use of illicit substances and appeared medically stable. (Tr. 536.) That same day, Crowell attended individual therapy and her weekly random urinalysis test was positive for THC. (Tr. 535, 557.)

- September 28- Crowell attended a counseling session. (Tr. 532.)

- October 1- Crowell missed her methadone dose due to illness, but denied illicit drug use and appeared medically stable. (Tr. 533.)

- October 3- Crowell attended a group counseling session. (Tr. 531.)

- October 4- Crowell's weekly random urinalysis test was positive for THC. (Tr. 557.)

- October 5- Crowell participated in a group counseling session. (Tr. 529-30.)

- October 8- Crowell participated in a group counseling session. (Tr. 529-30.)

- October 10- Crowell missed her methadone dose because she suffered a self-reported seizure. (Tr. 528.) That same day, a CODA medical doctor, June Longway ("Longway"), completed a progress note indicating Crowell was anxious, scattered in her thinking, and showed signs of memory deficits, *e.g.*, she was unable to state the doses of medication she was taking. (Tr. 527.)

- October 17- Crowell missed her methadone dose due to illness and stomach cramps. (Tr. 526.)

- October 23- Crowell missed her methadone because she was sick, but denied use of illicit drugs. (Tr. 525.)

- October 24- Crowell attended individual therapy. (Tr. 524.)

- October 25- Crowell missed her methadone dose due to illness, but she denied illicit drug use and appeared medically stable. (Tr. 523.)

- October 26- Crowell participated in group counseling. (Tr. 519.)

- November 9- Crowell participated in a group counseling session. (Tr. 521.)

- November 16- Crowell participated in group counseling. (Tr. 516.)

- November 20- Crowell missed her methadone dose due to "leg problems," but denied use of illicit drugs and appeared stable. (Tr. 520.)

- November 23- During a group counseling session, Crowell denied being suicidal, "but [said] if she were, she . . . would throw herself and her dog in front of a train." (Tr. 518.)

- November 27- During an individual therapy session, Crowell reported she had been able to abstain from illicit opiates. (Tr. 515.)

- November 30- During a group counseling session, Crowell "admitted to rapidly changing emotional states that sometimes bec[o]me difficult to manage, and expressed hope that things would improve in the future, as [her] length of time in recovery increased." (Tr. 514.) She also "agreed that great persever[a]nce and sense of purpose would be needed to prevail." (Tr. 514.) That same day, Crowell's weekly random urinalysis test was positive for THC. (Tr. 555.)

- December 6- Crowell thought she may get kicked out of CODA due to complaints regarding her dog and that Crowell was concerned about people "lying about her and creating stress in her life." (Tr. 510.)

- December 7- During a group counseling session, Crowell recognized symptoms associated with the onset of her anger and rage, such as headaches, tension, hyperventilation, clenched jaw, and hot flashes. (Tr. 508.) Crowell worked on ways to cope with her anger during the session. (Tr. 508.) That same day, Crowell spoke with a therapist individually at CODA as well. (Tr. 509.)

Page 25 - FINDINGS AND RECOMMENDATION

- December 10- Crowell participated in an unscheduled individual therapy session and reported having a recent altercation with a CODA group facilitator, who she felt was singling her out and treating her unfairly. (Tr. 506.) Crowell also reported she was struggling with medical issues and needed to see her primary care provider. (Tr. 506.)
- December 13- Crowell missed her methadone dose due to "arthritic pain" and denied any illicit drug use. (Tr. 507.)
- December 19- Crowell missed her methadone dose due to illness and denied illicit drug use. (Tr. 505.)
- December 21- Crowell set long-term and short-term recovery goals during a group counseling session at CODA. (Tr. 504.)
- December 25- Crowell's weekly random urinalysis test was positive for THC. (Tr. 554.)
- January 2, 2008- Crowell missed her methadone dose because she was "too busy at home to come in." (Tr. 502.) Crowell denied use of illicit substances and her gait, speech, pupils, and sensorium appeared normal. (Tr. 503.) Crowell's weekly random urinalysis test was positive for THC. (Tr. 554.)
- January 3- Crowell attended a group counseling session on empathy. (Tr. 503.)
- January 7- Crowell's weekly random urinalysis test was positive for THC. (Tr. 554.)
- January 8- Crowell participated in group counseling at CODA. (Tr. 499.)
- January 11- Crowell missed a methadone dose because she was unable to wake up. (Tr. 498.)
- January 16- During an individual counseling session at CODA, Crowell's "affect was flat" and she did not make a lot of eye contact. (Tr. 497.)
- January 18- Crowell participated in a CODA group counseling session. (Tr. 496.)
- January 23- Crowell attended a CODA group counseling session. (Tr. 495.)
- January 28- Crowell missed her methadone dose due to a "home emergency," but denied use of illicit substances. (Tr. 494.)
- February 1- Crowell attended a group counseling session and discussed her "personal history regarding cocaine use and consequences of use." (Tr. 493.)

Page 26 - FINDINGS AND RECOMMENDATION

- February 7- Crowell was ill and missed her methadone dose. (Tr. 491.)
- 

On February 11, 2008, Crowell visited Greg Allers ("Allers"), M.D., at Westside Primary Care Clinic, complaining of a bad cough and congestion. (Tr. 408.) Allers prescribed Crowell Erythromycin. (Tr. 408.) Crowell returned to Westside Primary Clinic two days later because her cough had not improved and she was having difficulty sleeping. (Tr. 409.) Crowell asked for smoking patches and cough medication and was given a prescription for nicoderm and robitussin. (Tr. 409.)

On February 14, 2008, Crowell called Westside Primary Clinic and reported she was experiencing stomach cramps from the Erythromycin. (Tr. 408.) After requesting a different medication, Crowell was prescribed Doxycycline. (Tr. 408.)

The medical evidence provided by Crowell's methadone clinic from February 29 through April 25 indicates the following:

- February 29- Crowell attended a group counseling session.
- March 5- Longway completed a progress note indicating Crowell was depressed about her living situation. There is a lot of drug use at Crowell's apartment complex and she feels it is "[n]ot a good place for [her] to be." (Tr. 488.) In Longway's opinion, Crowell was psychiatrically stable on her current medications (Clonazepam, Zoloft, Trazodone). (Tr. 488.)
- March 7- Crowell attended a group counseling session and reported illicit drug use "wasn't fun anymore." (Tr. 487.) Crowell said, "I'm too old to be using and I want a relationship with my children." (Tr. 487.)
- March 10- Crowell missed her methadone dose due to illness.
- March 14- During an unscheduled individual therapy session, Crowell reported she had permanent housing and had been abstaining from illicit opiates.

Page 27 - FINDINGS AND RECOMMENDATION

- March 17- Crowell missed her methadone dose because she was not feeling well and denied any illicit drug use.

- March 21- Crowell attended group counseling.

- March 28- Crowell attended group counseling.

- April 4- Crowell attended group counseling and an unscheduled individual therapy session.

- April 9, 2008, Crowell participated in unscheduled individual therapy session.

- April 11- Crowell attended group counseling.

- April 14- Crowell called CODA and reported "that she slept [with] the window open and got a chill and [was] unable to come to t[he] clinic to dose" that day. (Tr. 475.)

- April 15- Crowell missed her methadone dose.

- April 18- Crowell missed her methadone dose.

- April 21- Crowell had an individual therapy session at CODA.

- April 23- Longway completed a progress note, indicating Crowell was "[p]sychiatrically stable" on her current medications (Zoloft, Clonazepam, and Trazodone). (Tr. 473.) Crowell said she was "doing better" and continued to be clean and sober. (Tr. 473.)

- April 25- Crowell attended a group counseling session at CODA.

On April 25, 2008, Daniel Scharf ("Scharf"), Ph.D., saw Crowell for a Neuropsychological Screening Examination. (Tr. 578.) Scharf's examination consisted of a diagnostic interview, mental status examination, and the administration of psychological testing (the verbal portions of the WAIS-III and WMS-III). (Tr. 579.) Despite testing positive for THC eight times since August of 2007, Crowell told Scharf she last smoked marijuana "a long time ago."[6]

---

[6] Crowell also reported to Scharf she had been married three times; however, during Leung's August 3, 2005 psychiatric evaluation, Crowell said she had been married five times. (Tr. 302, 508.)

Page 28 - FINDINGS AND RECOMMENDATION

1   (Tr. 580.)   Scharf's diagnostic impression included "Major

2   Depressive Disorder, Recurrent, Moderate" and PTSD (Axis I); "Mixed

3   Personality Disorder with Borderline and Antisocial Features" (Axis

4   II); current psychological stressors regarding employment,

5   finances, and health (Axis IV); and a GAF at 50 (Axis V).   (Tr.

6   583-84.)   According to Scharf, Crowell

> did not show significant cognitive problems on
> psychological testing. She is presenting with mood
> difficulties, PTSD, and Personality Disordered symptoms.
> Her reported abusive and neglectful childhood is probably
> the major cause of her difficulties which in turn caused
> personality problems.   Her Personality Disorder is
> probably her biggest psychological barrier to maintaining
> work.

(Tr. 584.)

The medical evidence provided by Crowell's methadone clinic

from May 5 through June 26 indicates the following:

• May 5- Crowell missed her methadone dose.

• May 8- Crowell missed her methadone dose due to Hepatitis C-
  related fatigue.

• May 9- Crowell attended group counseling.

• May 12- Crowell attended group counseling.

• May 13- Crowell missed her methadone dose.

• May 16, 2008, Crowell attended group counseling.

• May 20- Crowell missed her methadone dose the day before due
  to heat exhaustion, but denied using any illicit substances.

• May 23- Crowell attended group counseling and her weekly
  random urinalysis test was positive for THC.

• May 28- Crowell approached a CODA staff member and said she
  was "so pissed off" because another CODA client, who "sells
  benzodiazepines to other clients," told people her counselor
  was being fired.   (Tr. 464.)

• May 30- Crowell attended group counseling.

Page 29 - FINDINGS AND RECOMMENDATION

- June 3– Crowell missed her methadone dose.

- June 6– Crowell attended group counseling.

- June 9– Crowell missed her methadone dose.

- June 13– Crowell attended an unscheduled group counseling session at CODA.

- June 27– Crowell met with a CODA therapist and appeared to be anxious and in a "somewhat depressed mood." (Tr. 453.) Crowell expressed concern regarding her health and "apartment situation" because "someone had been left dead in their car and someone . . . threatened her dog." (Tr. 453.)

- June 26– Crowell's weekly random urinalysis test was positive for THC.

In a letter dated July 15, 2008, CODA mental health specialist Judith Harrigan ("Harrigan"), M.A., indicated Crowell

> is being treated in our clinic for several debilitating mood and mental status diagnoses. These mental health conditions cause severe impairment to Ms. [Crowell]'s functioning in economic, social, and personal role functions. As well, she deals with a history of trauma and abuse and immediate recall problems that increase the comorbidity with both her dual diagnosis status and her medical condition. It is unlikely that Ms. [Crowell] will be able to maintain a stable and safe life without treatment and financial assistance.

(Tr. 586.)

In a July 15, 2008 letter to Crowell's counsel, Dr. Allers noted that Crowell "has a number of medical problems that limit her, including moderate knee arthritis, mild arthritic changes affecting her back, and multi-joint pain, probable left shoulder bursitis/tendentious, vision loss, and Hepatitis C, which causes fatigue and contributes to her pain." (Tr. 606.) In his concluding remarks, Allers stated:

> [Crowell] would not be able to work at any job that requires prolonged standing or walking [due to her underlying arthritic conditions]. I have reviewed the

Page 30 - FINDINGS AND RECOMMENDATION

psychological evaluations done by Dr. Scharf and Dr. Spendal. They are largely consistent with my impression of Ms. [Crowell]. I agree that she would not be able to handle close supervision, work with the public, or [work] in close proximity to co-workers due to her irritability, poor frustration tolerance, and potential for uncontrollable anger outbursts. She would have difficulty maintaining a regular work schedule due to her fatigue and lack of stamina, poor motivation, panic (seizures), and pain. If she were place[d] in a competitive work environment, her symptoms would only worsen. It is unlikely that she would be able to sustain work due to impulsivity and poor judgment, and her high level of hostility to others in the work area. Ms. [Crowell] was a victim of significant abuse in her family of origin. Her behavior patterns are not the sort that are easily modified with treatment or medication. Though she is largely compliant with treatment recommendations, there is little realistic expectation that she will change significantly[.] Ms. [Crowell] is a reliable historian and is not malingering.

(Tr. 606-07.)

During the July 17, 2008 hearing, Crowell indicated she was fifty-three years old, 5'1" tall, and weighed 138 pounds. (Tr. 44-45.) She is not married and has two boys that are thirty-one and thirty-five years old. (Tr. 45.) Crowell has not had a drivers license for seven years because she suffers from seizures and has "an eyesight issue." (Tr. 45.) Crowell has completed eighteen years of formal education, including college where she graduated with a liberal arts degree and 3.63 grade point average. (Tr. 46.)

Crowell's last job involved conducting telephone surveys for Market Strategies in 2005. (Tr. 47.) Crowell resigned because "when [she]'d go into work . . . anything would set [her] off and . . . [she] would be crying all the time." (Tr. 47.) Crowell worked at Cascade Auto Glass from January to September 2003 doing "phone sales." (Tr. 48.) Crowell resigned from Cascade Auto Glass since she was having "trouble working with people." (Tr. 48.)

Page 31 - FINDINGS AND RECOMMENDATION

Prior to working for Cascade Auto Glass, Crowell had "a business called Portable Janitorial" where she "did janitorial work and residential cleaning" from 1998 to 2004. (Tr. 49.) Crowell turned the business over to her son in 2005 because she could no longer handle the day-to-day physical demands. (Tr. 52.) Crowell also worked at A-Ball Plumbing for six months as a sales representative, but left the position in order to focus on her janitorial business. (Tr. 52-53.) The remainder of Crowell's employment history consists of brief stints as a real estate agent, a car salesman at Thomason Honda, a bartender at Rip City Diner, and a travel trailer and camper salesman.[7] (Tr. 53-57.)

Crowell, who has not looked for a job since 2005, has her rent and utilities paid by the Housing Authority of Portland ("HAP") and receives around $163.00 a month in food stamps. (Tr. 58.) She has a criminal history which includes convictions for theft and forgery in 1983 and 1984, respectively. (Tr. 59.) As recently as 2005, Crowell has been convicted of other unspecified crimes, but the convictions have been taken off her record since she performed community service. (Tr. 59.) Crowell believes she has "been unable to work with people" her "whole life" because she is emotionally volatile and does not trust or feel comfortable around others. (Tr. 60.) Crowell attributes this behavior to a bevy of "emotional and mental" issues, such as depression, separation

---

[7] Crowell could not specifically recall when she worked as a real estate agent, but she did indicate that she took classes and received a license. (Tr. 55.) With respect to Thomason Honda, Crowell found her sales position "too draining" and resigned after two or three months. (Tr. 54.)

Page 32 - FINDINGS AND RECOMMENDATION

anxiety, and PTSD. (Tr. 60-61.)  In terms of physical limitations, Crowell indicated she has hepatitis C which makes her feel "tired all the time" and arthritis that causes pain in her back, knees, shoulders, and ankles.  (Tr. 61-62, 85.)  Her physical ailments make it difficult to use stairs and stay seated for extended durations.  (Tr. 82-83, 86.)

Although Crowell has not used alcohol on a consistent basis since she was twenty-five years old, she admits to using illegal drugs throughout her life, including cocaine, heroin, marijuana, and methamphetamine.  (Tr. 65-66.)  Crowell testified that, as of July 17, 2008, she had not used marijuana in two months, heroin and cocaine in the last year, and methamphetamine or amphetamines since the 1970's.[8]  (Tr. 66.)  Crowell claims her recent use of cocaine and heroin may have been related to methadone withdrawal, *i.e.*, "being detoxed off of [m]ethadone." (Tr. 69, 78.)  Crowell went on to state:

> I would be addicted to everything because I'm an addict.
> But . . . [things are] going very well now . . . as long
> as I'm not rapidly detoxed off my Methadone. [Otherwise,]
> I become suicidal is what happens [to] me. . . . [B]efore
> I'd relapse I've literally gone into the hospital
> emergency room and begged them to help me and . . . [said
> that] I was going to kill myself.  I could not take the
> emotional and physical things that were happening in my
> body at the time.

(Tr. 70.)  Crowell described being detoxed from methadone as follows:

> I feel like I want to die. I, emotionally I don't
> function at all. I'm hysterical. I'm like on this big

_____

[8] Crowell confirmed that she tested positive for heroin on August 31, 2007, used cocaine in April and August 2007, and tested positive for marijuana on numerous occasions.  (Tr. 68, 70, 72.)

Page 33 - FINDINGS AND RECOMMENDATION

roller coaster and can't . . . see the end of the tunnel. Physically I'm sick. You can't sleep, you can't eat, you can't take care of yourself, you don't know what to do.

(Tr. 79.)

Despite participating in several drug treatment programs, Crowell admits to relapsing in 2005 and 2007. (Tr. 69, 71.) With respect to the 2007 relapse period, Crowell stated, "[t]he days I couldn't use Heroin I would use Cocaine so I would probably [use Cocaine] three days out of a week and that period lasted about three . . . [or] five months."[9] (Tr. 72.)

Crowell's seizures, which she says are anxiety-related, cause her to: "feel like [she is] going to explode inside," hyperventilate, "get really dizzy," "go through horrible tremors," and lose consciousness at times. (Tr. 74-75.) In order to prevent or minimize the risk of seizures, Crowell takes an anti-seizure medication called Clonazepam and has a "seizure alert dog." (Tr. 74, 77.) According to Crowell, she also experiences "rage episodes or rage blackouts," which she equates to "having a blackout from drinking alcohol." (Tr. 80.) Apparently, if Crowell feels like her children have been hurt, her integrity has been questioned, she has been mistreated, badgered, or lied to, she experiences "homicidal impulses." (Tr. 80-81.) Crowell has a particular distaste for liars because "when people aren't accountable for their behavior . . . it makes [her] crazy." (Tr. 81.) Crowell indicated that her typical day consists of attending doctor

---

[9] Crowell was less than clear as to certain dates and/or years she used various illegal drugs. Crowell claims she is "not a dishonest person" and simply has "difficulty with memory as a result of [her] seizures." (Tr. 74.)

Page 34 - FINDINGS AND RECOMMENDATION

appointments, walking her dog, and going to her methadone clinic. (Tr. 85.)

During the July 18, 2008 hearing, the ALJ also received testimony from Vocational Expert ("VE") Kay Wise. (Tr. 86.) The ALJ asked the VE to consider a person of Crowell's "age, education, and past relevant work experience," who is able to lift twenty pounds occasionally, ten pounds frequently, sit or stand for six hours out of an eight-hour workday, and occasionally climb, stoop, kneel, crouch, and crawl. (Tr. 89.) The VE stated that an individual with these limitations could perform Crowell's past relevant work as a salesman (retail, automobile or camper), housecleaner, telemarketer, and bartender. (Tr. 89.)

The ALJ asked the VE to consider the same hypothetical individual, but with the addition that the individual "is able to do simple tasks and can be involved in minimal social interaction." (Tr. 89.) The VE stated that such an individual could only perform Crowell's past relevant work as a housecleaner, which is a job that exists in significant numbers in the national economy. (Tr. 89-90.)

Crowell's counsel asked the VE to add the following criteria to the ALJ's hypothetical:

> That the worker would not be able to tolerate any contact with the general public, minimal interaction with co-workers and supervisors. And it would need to be gentle nonconfrontational supervision. That the worker would occasionally need unpredictable breaks to either lie down or remove herself from the work area due to both psychological and/or physical symptoms. And/or would need to leave work due to panic or seizure activity between one and five times a month on an unpredictable basis.

Page 35 - FINDINGS AND RECOMMENDATION

(Tr. 90.)  The VE stated that such an individual could not sustain employment in the occupations previously recited.  (Tr. 90.)

After the July 18, 2008 hearing, additional medical evidence was provided by Crowell's methadone clinic from December 9, 2008 through October 13, 2009.  This additional evidence shows the following:

- December 9- Crowell missed her methadone dose due to dental surgery, but denied use of illicit substances.

- December 12- Crowell attended group counseling at CODA.

- December 19- Crowell attended group counsel.[10]

- January 8, 2009- During an individual therapy session, Crowell reported being denied SSI benefits and did "present as wanting to acquire new recovery skills or tools."  (Tr. 671.)

- January 12- Crowell attended group counseling at CODA.

- January 13- Crowell missed her methadone dose because she was "unable to make it here, [but] denie[d] illicit drug use."  (Tr. 668.)

- January 20- Crowell attended group counseling sessions at CODA.

- January 23- Crowell attended group counseling.

- January 29- During individual therapy, Crowell said she was doing "better" and reported that "THC seems to benefit her medicinally over benzodiazepines."  (Tr. 664.)

- February 2- Crowell missed her methadone dose because she overslept, but denied any illicit drug use.

- February 4- Crowell missed her methadone dose.

- February 6- Crowell attended group counseling.

- February 13- Crowell attended group counseling.

---

[10]  The ALJ issued her written decision on December 23, 2008; however, it is well settled that "[p]ost-decision evidence considered by the Appeals Council is part of the record on review by this Court."  *Susa v. Astrue*, No. CV 10-6478 JCG, 2011 WL 2076334, at *3 (C.D. Cal. May 26, 2011) (citation omitted).

Page 36 - FINDINGS AND RECOMMENDATION

- February 18- During an individual therapy session, Crowell reported feeling "peaceful and calm" after cutting back on her use of benzodiazepines. (Tr. 659.) Crowell indicated that "using marijuana calms her nerves and prevents her from having 'outbursts' when feeling stressed." (Tr. 659.) Crowell was told "her use of marijuana over benzodiazepines is a good method of harm reduction, as long as she obtains her medical marijuana card." (Tr. 659.)

- March 5- Crowell was informed she was "losing her Saturday methadone takeout due to unregistered benzo use." (Tr. 657.) According to the CODA progress note, Crowell "receives methadone at this clinic and taking benzos at an unprescribed amount is dangerous." (Tr. 657.)

- March 6- CODA medical doctor, Jonathan Berman ("Berman"), M.D., completed a progress note, indicating Crowell's "Saturday takeout rescinded because of 2/02/09 UA positive for significant amounts of non-prescribed alprazolam in addition to prescribed clonazepam." (Tr. 656.)

- March 7- Crowell attended group counseling.

- March 20- Crowell attended group counseling.

- March 26- Crowell requested additional "methadone takeout," but was informed "she must have a medical marijuana card prior to receiving another takeout due to her continued THC use." (Tr. 652.)

- March 27- Crowell attended group counseling at CODA and shared "about how other people in [her] family and circle of friends expressed their concern about [Crowell]'s use of illicit drugs." (Tr. 651.)

- April 9- Crowell missed her methadone does because she was ill.

- April 10- Crowell attended group counseling.

- April 16- Crowell's "UA's indicate continued use of THC and recent positive UA's for unregistered benzodiazepines." (Tr. 647.)

- April 17- During group counseling, Crowell reported she obtained "a THC medical card due to her not wanting to use benzodiazepine medications to decrease her anxiety/stress." (Tr. 645.)

- April 24- Crowell attended group counseling.

Page 37 - FINDINGS AND RECOMMENDATION

- April 28- Crowell missed her methadone dose because she was sick.

- May 1- Crowell attended group counseling.

- May 7- Crowell missed her methadone dose due to "being sick," but denied any illicit drug use. (Tr. 641.)

- May 8- Crowell attended group counseling.

- May 15- Crowell attended group counseling.

- May 21- During individual therapy, Crowell reported "she ha[d] put off getting her medical marijuana card right now due to not having enough money to get it." (Tr. 638.) It was also noted that Crowell's urine analyses indicated that she was not taking her prescription for Clonazepam (Klonopin). (Tr. 638.) Apparently, "[r]umors within the clinic among [Crowell]'s peers suggest[ed] she [was] selling her Klonopin tablets." (Tr. 638.)

- May 22- Crowell attended group counseling.

- May 29- Crowell attended group counseling.

- June 12- Crowell attended group counseling.

- June 19- Crowell attended group counseling.

- June 26- Crowell attended group counseling.

- July 2- Crowell attended group and individual therapy sessions.

- July 10- Crowell attended group counseling.

- July 22- Crowell attended individual therapy.

- July 24- Crowell attended group counseling.

- July 29- Crowell attended individual therapy.

- July 30- Crowell attended group counseling.

- July 31- Crowell attended group counseling.

- August 7- Crowell attended group counseling.

- August 12- Crowell attended individual therapy.

- August 13- Crowell's mental health issues and "continued THC use" made her ineligible to transition to the next level of her treatment plan. (Tr. 622.)

Page 38 - FINDINGS AND RECOMMENDATION

- August 14- Crowell attended group counseling.
- August 19- Crowell missed her methadone dose because she was sick.
- August 20- Crowell attended group counseling.
- August 25- Crowell missed her methadone dose because she "fell [and] hurt herself." (Tr. 619.)
- August 27- Crowell attended individual therapy.
- August 28- Crowell attended group counseling.
- September 1- Crowell missed her methadone dose because she was sick.
- September 4- Crowell attended group counseling.
- September 11- Crowell attended group counseling.
- September 29- Crowell attended individual therapy.
- October 2- Crowell attended group counseling.
- October 6- Crowell attended group counseling.
- October 12- Crowell attended individual therapy.
- October 13- During an individual therapy session, Crowell showed "signs of manic behavior" and "had a difficult time staying focused and continued to digress from topic." (Tr. 609.)
-

    In a letter to Crowell's counsel dated November 13, 2009, Michelle Campbell ("Campbell"), a social worker and qualified mental health professional, stated:

> I have been seeing Ms. [Crowell] for individual therapy [at CODA] on a weekly basis since June 1, 2009. . . . [Crowell] lacks social skills, has anger issues, and has difficulty dealing with people. She has been diagnosed with Bipolar Disorder [and Borderline Personality Disorder], and she has intense and labile moods. . . . Though she has a long history of substance dependence, she is consistent with her treatment at CODA. . . . Per her report, her only relapses in many years have occurred when she has been unable to get appropriate medication. . . . I cannot see [Crowell] being able to

Page 39 - FINDINGS AND RECOMMENDATION

work in coordination with or even proximity to others without becoming involved negatively with them. She would most likely be prone to anger outbursts or confrontations of one sort or another. Ms. [Crowell] would most likely have a difficult time focusing on any sort of work when experiencing her hypomanic episodes, due to her constant obsessing over the past. . . . I cannot imagine her being successful in any sort of workplace due to the labile and persistent symptoms she experiences.

(Tr. 689-90.)

Similarly, in a letter dated November 19, 2009, Todd Engrstrom ("Engstrom"), M.D., stated: "In my estimation, [Crowell] is disabled. Her disability stems from her mental health issues. She carries a diagnosis of bipolar disease and borderline personality. She also has some agoraphobia and PTSD. . . . [F]rom my observations, I cannot conceive of th possibility of her functioning successfully in a work environment." (Tr. 688.)

### III.   DISABILITY DETERMINATION AND THE BURDEN OF PROOF

#### A.   Legal Standards

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520)).  The Keyser court described the five steps in the process as follows:

(1) Is the claimant presently working in a substantially gainful activity?   (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regula- tions?  (4) Is the claimant able to perform any work that he or she has done in the past?  and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)).  The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled.  *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966 (describing "work which exists in the national economy"), and 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and word experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner fails meet this burden, then the claimant is disabled, but if the Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not

disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f), 416.920(f)); *Tackett*, 180 F.3d at 1098-99).

The ALJ determines the credibility of the medical testimony and also resolves any conflicts in the evidence. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Ordinarily, the ALJ must give greater weight to the opinions of treating physicians, but the ALJ may disregard treating physicians' opinions where they are "conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings." *Id.* (citing *Matney, supra; Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)). "[T]he Commissioner must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician. . . . [And,] the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995) (citations and internal quotation marks omitted).

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's subjective symptom testimony, the ALJ must engage in a two-step analysis. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Under the first step prescribed by *Smolen*, . . . the claimant must produce objective medical evidence of underlying "impairment," and must show that the impairment, or a combination of impairments, "could reasonably be expected to produce pain or other symptoms." *Id.* at 1281-82. If this . . . test is satis-fied, and if the ALJ's credibility analysis of the claimant's testimony shows no malingering, then the ALJ

may reject the claimant's testimony about severity of symptoms [only] with "specific findings stating clear and convincing reasons for doing so." *Id.* at 1284.

*Batson*, 359 F.3d at 1196.

### B.  The ALJ's Decision

At the first step of the five-step sequential evaluation process, the ALJ found that Crowell had not engaged in substantial gainful activity since January 1, 2005, the alleged disability onset date. (Tr. 27.) At the second step, the ALJ found that Crowell had the following severe impairments: drug addiction and alcohol abuse; a personality disorder or traits; a depressive disorder; an anxiety-related disorder(s); and osteoarthritis affecting the right knee and possibility other joints. (Tr. 27.) At the third step, the ALJ found that Crowell's combination of impairments were not the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1. (Tr. 28.) The ALJ therefore assessed Crowell as having the residual functional capacity ("RFC") to:

> lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for a total of six hours in an eight-hour workday; and sit for a total of six hours in an eight-hour workday. She can occasionally climb, stoop, kneel, crouch, and crawl, and she can perform simple tasks involving only minimal interaction socially. However, the claimant would not be able to persist for full-time work.

(Tr. 29.) At the fourth step of the five-step process, the ALJ found that Crowell was unable to perform any past relevant work. (Tr. 31.) At the fifth step, the ALJ found in light of Crowell's age, education, work experience, and RFC that there were *no* jobs

existing in significant numbers in the national and local economy that she could perform.  (Tr. 31.)

However, because "benefits are not payable when substance abuse is a contributing factor material to the determination of disability," the ALJ evaluated the extent to which Crowell's "mental and physical limitations would remain if she stopped substance abuse."  (Tr. 32.)  The ALJ determined that, even if Crowell "stopped substance abuse," she would continue to have a severe impairment or combination of impairments, but her impairment(s) would not meet or medically equal a listing.  (Tr. 32.)  The only alteration to the ALJ's RFC assessment was the exclusion of the statement concerning Crowell's ability to persist for full-time work.  (Tr. 33.)  The ALJ then stated, "[i]f the claimant stopped substance abuse, she would be able to perform past relevant work as a housecleaner" because it would not require performance of work-related activities precluded by her RFC. (Tr. 39.)  The ALJ thus concluded that she was not disabled as defined in the Act from January 1, 2005 though December 23, 2008. (Tr. 40.)

### IV.   STANDARD OF REVIEW

The court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black v. Comm'r*, 433 Fed. Appx. 614, 615 (9th Cir. 2011).  Substantial evidence is "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as

Page 44 - FINDINGS AND RECOMMENDATION

adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)). Instead, the court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Id.* However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the court may not substitute its judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citation omitted).

## V. DISCUSSION

Crowell appeals the ALJ's December 23, 2008 decision on three grounds. She alleges that (1) the ALJ improperly discredited Crowell's and Magin's testimony, (2) the ALJ erred in finding that substance abuse was material to Crowell's disability, and (3) the ALJ erred by improperly assessing the opinions of her treating and examining physicians. I address each claim in turn.

### A. Credibility Determinations

Crowell asserts the ALJ erred in finding that her testimony and Magin's lacked credibility. An ALJ may only reject a claimant's testimony concerning the severity of her symptoms "by offering, specific, clear and convincing reasons for doing so." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). In making this determination, an ALJ should consider "ordinary techniques of credibility evaluation," including the claimant's

reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." *Smolen*, 80 F.3d at 1284.   If the ALJ's credibility finding is supported by substantial evidence in the record, district courts may not engage in second-guessing.  *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

Contrary to Crowell's contentions, the ALJ did not reverse the manner in which credibility must be considered, nor did the ALJ fail to provide specific, clear and convincing reasons for discounting Crowell's testimony.   It is well settled that "an ALJ may not simply define an RFC and then, without more, conclude the claimant's testimony is only credible to the extent it aligns with the RFC."  *Bostic v. Astrue*, No. 3:10-cv-01153-HU, 2010 WL 786909, at *1 (D. Or. Mar. 9, 2012).  But "[t]here is nothing wrong with an ALJ stating a conclusion and then explaining it[.]" *Id.*   That is exactly what the ALJ did here.   Specifically, the ALJ stated: "[T]he claimant's assertion of disability and her statements concerning the intensity, persistence and limiting effects of her symptoms are not credited to the extent they are inconsistent with the [RFC] assessment for the reasons explained below."  (Tr. 34-35.)  Those reasons included: (1) that the record contained several instances where Crowell provided inaccurate or incomplete reports; and (2) Crowell's criminal history.  *See Strong v. Astrue*, No. C11-5558-RSL, 2012 WL 993529, at *8 (W.D. Wash. Mar. 1, 2012) (holding that a claimant's inconsistent statements concerning drug use rendered her testimony not credible); *see also Boyd v. Astrue*, No. C10-1552-RSM, 2011 WL 3881488, at *7-8 (W.D. Wash. July 18, 2011)

1  (upholding adverse credibility determination based, most notably,

2  on the claimant's drug use and history of crimes of dishonesty,

3  including theft and shoplifting).

4      For example, during Scharf's April 2008 examination, Crowell

5  said she last smoked marijuana "a long time ago," even though she

6  had tested positive for THC eight times, over the span of five

7  months, since August of 2007 (e.g., August 31, September 18,

8  September 25, October 4, November 30, and December 25, 2007, and

9  January 2 and January 7, 2008).   Considering Crowell provided

10 successive urine specimens during this time period, not all of

11 which tested positive for THC (e.g., November 22 and December 20,

12 2007), it seems highly unlikely that Crowell's urinalyses reflected

13 marijuana which remained in her system from prior use.

14     With respect to Crowell's criminal history, the record

15 indicates that she has numerous arrests and/or convictions related

16 to stealing and forgery. (*See* Tr. 298.)   In fact, in May of 2007,

17 Taylor reported that Crowell was recently arrested for shoplifting.

18 *See Newport v. Astrue*, No EDCV 11-180-JEM, 2012 WL 1044487, at *5-6

19 (C.D. Cal. Mar. 28, 2012) (upholding adverse credibility

20 determination based, in part, on the claimant's history of arrests

21 for theft and possession of drugs); *see also Buck v. Astrue*, 2011

22 WL 2600505, at *11 (W.D. Wash. June 28, 2011) (stating that "being

23 arrested for theft, taking a motor vehicle without permission and

24 forgery -- all crimes of dishonesty -- w[ould] certainly have a

25 strong bearing on credibility.")

26     Crowell also confirmed that she served time in prison for

27 forgery in 1983.  (Tr. 59, 250.)  The Eighth Circuit addressed a

28

comparable situation in *Simmons v. Massanari*, 264 F.3d 751 (8th Cir. 2001).    There, the claimant applied for social security benefits in December 1993, and alleged disability since June 1952. *Simmons*, 264 F.3d at 752.   After noting that the claimant "served time in prison for forgery in 1956 and 1957," *id.* at 754, the Eighth Circuit concluded there was "substantial evidence in the record to support the ALJ's" adverse credibility determination because (1) the record indicated the claimant provided "several conflicting statements in the past" and (2) "he served time for forgery." *Id.* at 755.[11]

In sum, the foregoing reasons offered by the ALJ to justify her adverse credibility determination are clear and convincing and supported by substantial evidence in the record.   Accordingly, the ALJ did not err in her assessment of Crowell's testimony.

Similarly, the ALJ did not err in her assessment of Magin's testimony.   "An ALJ need only give germane reasons for discrediting the testimony of lay witnesses." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).   For example, in *Gray v. Comm'r of Soc. Sec. Admin.*, 365 F. App'x 60 (9th Cir. 2010), the ALJ "properly considered" lay witness testimony and gave germane reasons for deeming it deserving of "less weight" because the observed limitations "could just as easily have been caused by substance abuse," an issue the lay witness failed to discuss. *Gray*, 472 F. App'x at 62.   In this case, as in *Gray*, the ALJ noted that Magin

---

[11]  The Eighth Circuit's decision in *Simmons* has been favorably cited by district courts in this circuit. *See, e.g., Weirich v. Astrue*, No. ED CV 10-51-PLA, 2010 WL 4736481, at *5 (C.D. Cal. Nov. 15, 2010).

Page 48 - FINDINGS AND RECOMMENDATION

failed to "provide information regarding the claimant's drug use or the effects of drug use on her functioning and abilities," and accordingly declined to assign Magin's testimony "significant weight in determining the claimant's functioning absent substance abuse." (Tr. 36.)   Thus, I conclude that the ALJ gave a germane reason for discrediting Magin's testimony. *See Strauss v. Astrue*, No. 08-0931-AA, 2012 WL 1035715, at *5 (D. Or. Mar. 23, 2012) ("holding that one germane reason is sufficient to discredit statements from lay witnesses" (citing *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009))).

### B.   The Drug Abuse and Alcoholism Analysis

Crowell argues that the ALJ erred in finding her ineligible for benefits because her substance abuse was a contributing factor material to her disability under 42 U.S.C. § 423(d)(2)(c). At step five, "[a] finding of 'disabled' . . . does not automatically qualify a claimant for disability benefits," *Bustamante*, 262 F.3d at 954, because a claimant cannot receive disability benefits "if alcoholism or drug addiction . . . would be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(c). The ALJ must therefore conduct a drug abuse and alcoholism analysis ("DAA Analysis") by determining which of the claimant's limitations would remain if she stopped using drugs. 20 C.F.R. § 404.1525(b). If the remaining limitations would still be disabling, the claimant's drug addiction is not a contributing factor material to the determination of disability. *Id.* By the same token, if the remaining limitations would not be disabling, the claimant's drug addiction is material

Page 49 - FINDINGS AND RECOMMENDATION

1  and benefits must be denied. *Id.* The claimant bears the burden of

2  proving her alcoholism or drug abuse is not material to the finding

3  of disability. *Ball v. Massinari*, 254 F.3d 817, 821 (9th Cir.

4  2001).

5      After finding Crowell disabled at step five, ALJ Lazuran moved

6  on to the DAA analysis and found that if Crowell stopped abusing

7  substances, "she would be able to perform past relevant work as a

8  housecleaner." (Tr. 39.) Because this would result in a finding

9  that Crowell was not disabled, ALJ Lazuran concluded that her

10 substance abuse was a contributing factor material to the

11 determination of disability and denied benefits.

12     Upon review, I conclude the ALJ did not err by concluding

13 Crowell's substance abuse was a contributing factor material to her

14 disability.   A brief summary of the post-onset date evidence

15 illustrates this point. In August 2005, Crowell told Leung she was

16 "clean and sober." (Tr. 302.)   In the fall of 2005, Crowell

17 reported to McCluskey that "her anxiety [wa]s manageable," "she

18 ha[d] not experienced any rage episodes," and "her ability to

19 handle and tolera[te] stressful situations ha[d] increased." (Tr.

20 595.)   She also "reported that her mood [wa]s a 7 out of

21 10 . . . [and] that her mood ha[d] been good for the past two

22 weeks." (Tr. 594.) In April 2006, McCluskey gave Crowell a GAF of

23 60, indicating she had "some difficulty in social, occupational, or

24 school functioning," but was "generally functioning pretty well,

25 [and] ha[d] some meaningful interpersonal relationships." *Vasquez*

26 *v. Astrue*, 572 F.3d 586, 594 n.6 (9th Cir. 2009). In March 2007,

27 after Crowell asked Taylor to sign a disability verification form

28

Page 50 - FINDINGS AND RECOMMENDATION

concerning her eligibility for disability, Taylor made it a point to state: "I did not indicate that I was attesting to her inability to engage in <u>any</u> substantial [gainful] activity." (Tr. 395.)

Soon thereafter, it appears that Crowell began abusing drugs again, which clearly impacted her mental status and ability to function. For example, Crowell confirmed she had occasionally been using marijuana and intravenous cocaine in April 2007. (Tr. 337-38.) The following month, Crowell reported that she had recently been arrested for shoplifting. (Tr. 392.) In July 2007, Crowell confirmed she "started using heroin again when her daily supply of methadone could only provide 40 mg a day[.]" (Tr. 387-88.) She also had a verbal altercation with a member of Taylor's staff. In early August 2007, Crowell was detained at Good Samaritan Hospital because she threatened to kill herself. She also reported spending "all of her time" thinking of ways to kill her dog and commit suicide. (Tr. 384.)

Despite Crowell's contention that she merely had "a withdrawal crisis and relapse in July 2007," (Pl.'s Br. at 21), it appears that Crowell's drug use has continued unabated. In late August 2007, Crowell continued experiencing suicidal thoughts and admitted to "using about one-half to one gram of heroin intravenously each day." (Tr. 448.) Her weekly urinalysis test was also positive for THC and opiates. In early September 2007, Crowell missed a methadone dose because she "was dope sick" and confirmed she had been using heroin twelve times a week, in varying amounts. (Tr. 545.) In October 2007, Crowell tested positive for THC and missed

five methadone doses.   Crowell also tested positive for THC in November 2007, December 2007, and January 2008.

In April 2008, Scharf gave Crowell a GAF of 50, indicating serious symptoms or serious impairment in functioning. *Campbell v. Astrue*, 627 F.3d 299, 303 (7th Cir. 2010).  In May and June 2008, Crowell once again tested positive for THC.   About six months later, in January 2009, Crowell reported that "THC seem[ed] to benefit her medicinally over benzodiazepines." (Tr. 664.)   In early February 2009, Crowell tested positive "for significant amounts of non-prescribed alprazolam in addition to prescribed clonazepam."   (Tr. 656.)   In March 2009, Crowell requested additional "methadone takeout," but was informed she could not receive another takeout "due to her continued THC use." (Tr. 652.) In April 2009, Crowell continued to test positive for THC.   In August 2009, Crowell was not eligible to transition to the next level of her treatment plan at CODA due, in part, to her continued THC use.

In short, I conclude that the ALJ's determination that substance abuse is a contributing factor material to the determination of disability is a rational interpretation of the evidence and should not be disturbed. *Andrews*, 53 F.3d at 1039.

### C. Medical Source Statements

Crowell also contends that the ALJ improperly rejected the opinions of her treating and examining physicians.  I disagree.

As a general rule, the opinion of a treating physician is entitled to greater weight than the opinion of a physician who did not treat the claimant. *Lester*, F.3d at 830.  Even if a treating

physician opinion is contradicted by another physician, "the Commissioner may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record for so doing." *Id.* (internal quotation marks omitted). Likewise, the opinion of an examining physician, even if contradicted by another physician, "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* at 830-31.

In the present case, the ALJ properly weighed the medical opinions in the record. The ALJ provided specific and legitimate reasons, supported by substantial evidence in the record, for giving less weight to the psychological evaluations of Spendal and Scharf, including that Crowell had not been entirely forthcoming or truthful with Spendal and Scharf about her history of substance abuse. *See Tate v. Astrue*, 431 F. App'x 565 (9th Cir. 2011) ("The ALJ provided specific and legitimate reasons . . . for giving less weight to the psychological evaluation . . . [because the claimant] had not been forthcoming with these doctors about his alcohol and substance abuse[.]"); *see also Savage v. Comm'r of Soc. Sec. Admin.,* 158 F. App'x 924, 925 (9th Cir. 2005) ("finding that a patient's provision of misinformation, unbeknownst to a doctor, served as a specific and legitimate reason for rejecting the doctor's opinion" (citing *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001))).

To be sure, during the July 2005 evaluation, Crowell told Spendal "she was three years clean and sober from heroin." (Tr. 250.) Then, in April 2008, Crowell told Scharf she had "been in

recovery for approximately four years" and had "relapsed on heroin briefly before her abstinence from drugs." (Tr. 580.) This conflicts with what Crowell told Spendal and the ALJ (i.e., that she relapsed in both 2005 and 2007). Crowell also told Scharf in April 2008 she last smoked marijuana "a long time ago," even though she had tested positive for THC eight times, over the span of five months, since August of 2007 (e.g., August 31, September 18, September 25, October 4, November 30, December 25, 2007, January 2 and January 7, 2008). Once again, considering Crowell provided successive urine specimens during this time period, not all of which tested positive for THC (e.g., November 22 and December 20, 2007), it seems highly unlikely that Crowell's urinalyses reflected marijuana which remained in her system from prior use.

The ALJ's discounting of Allers' conclusion because it was not well supported by medical signs or laboratory findings was also a legitimate reason. *See Haggerty v. Astrue*, No. 2012 WL 2884767, at *1 (9th Cir. July 16, 2012) ("The ALJ's discounting of Dr. Michel's conclusion because it was not well supported by acceptable diagnostic techniques was also a legitimate reason."); *see also* 20 C.F.R. §§ 404.1527(c)(2), (3), 416.927(c)(2)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.") With respect to Crowell's physical abilities and functioning, the ALJ properly gave greater weight to the evaluation of Jones because Jones' conclusions were consistent with the

evidence in the record.  *See Tonapetyan v. Halter,* 242 F.3d at 1149.

Moreover, the Ninth Circuit has "consistently upheld the Commissioner's rejection of the opinion of a treating or examining physician, based *in part* on the testimony of a nontreating, nonexamining medical advisor." *Morgan*, 169 F.3d at 602 (emphasis in the original).  In the present case, the ALJ pointed to the opinions of state agency medical consultants, such as Anderson and Eder.  In the concluding remarks of her December 2005 MRFCA, Anderson stated: Crowell is "capable of understanding, remembering and carrying out short and simple, but not detailed and complex instructions/tasks"; she "[s]hould not work in close proximity to, or in close coordination with more than a few others given [her history] of anxiety and PTSD"; she "should have limited, structured contact with the general public, coworkers and supervisors and should not be required to work in a public setting"; and "[n]o evidence of significant limitations."  (Tr. 291.)  Similarly, Eder's December 2005 PRFCA indicates Crowell "may have some [joint] pain from osteoarthritis but [there is] no evidence of significant limitations."  (Tr. 330.)

Lastly, Crowell argues that "[t]he ALJ failed to address Leung's opinion at all."  (Pl.'s Br. at 22.)  This simply is not true.  As the Commissioner appropriately points out, throughout her December 2008 written decision, the ALJ favorably cites to Leung's findings and the office treatment records from OHSU.  (*See, e.g.,* Tr. 38) (citing Exhibit No. 6F and providing a pinpoint citation to

Page 55 - FINDINGS AND RECOMMENDATION

Dr. Leung's August 2005 psychiatric evaluation). The ALJ thus did not err in this regard.

### VI. CONCLUSION

Following a careful review of the record, I conclude that the Commissioner's decision should be **AFFIRMED**.

### VII. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due **October 2, 2012.** If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due **October 19, 2012.** When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 12th day of September, 2012.

                               /s/ Dennis J. Hubel
                               DENNIS J. HUBEL
                        United States Magistrate Judge

Page 56 - FINDINGS AND RECOMMENDATION